## Public Water Supply.

*Waters—Pollution of streams—Offensive tastes and odors—Power of Sanitary Water Board—Administrative Code of June 7, 1923.*

Under section 1810 of the Administrative Code (Act of June 7, 1923, P. L. 498), the authority to prevent the pollution of public water supplies by substances which give to the water offensive tastes and odors, although they do not directly affect its bacteriological or disease-carrying quality, is vested in the Sanitary Water Board.

Department of Justice. Opinion to Hon. Charles E. Miner, M. D., Secretary of Health.

WELLS, Dep. Att'y-Gen., April 12, 1924.—On Feb. 26th you requested the opinion of the Attorney-General on the question whether or not the Department of Health has authority to prevent the pollution of streams, which are sources of public water supply, by substances which give to the water offensive tastes and odors, but do not directly affect its bacteriological or disease-carrying quality.

You then had specifically in view the Schuylkill River and the water supply of the City of Philadelphia. A brief examination of the question was

made, and the views of this department were informally conveyed to Mr. Stevenson of your department on March 5th as the basis for a conference which he was about to hold with the authorities of the City of Philadelphia. Further examination of the question was at that time postponed because of the pressure of other urgent matters before this department.

You have now informed me that you are about to confer with the health authorities of other states in the Ohio Valley, and that the same question is likely to come up at that conference. You have, therefore, renewed your request for a formal opinion.

Sections 8 and 9 of the Act of April 27, 1905, P. L. 312, gave to your department very broad powers "to protect the health of the people of the State and to determine and employ the most efficient and practicable means for the prevention or suppression of disease. The Commissioner of Health shall cause examination to be made of nuisances or questions affecting the security of life and health in any locality. . . . The Commissioner shall have power and authority to order nuisances detrimental to the public health or the causes of disease and mortality to be abated and removed." The statutes of other states, and other statutes of Pennsylvania with respect to cities within the Commonwealth, make similar broad grants of power for the same purpose.

No adjudicated case has been found upon the question whether powers thus broadly defined include the power to prevent offensive tastes and odors in public water supplies which are otherwise wholesome. The answer to your question must be made in the light of general principles as applied to known facts and conditions.

The statute requires you to protect the health of the people of the State, and leaves to you the determination of what are the most efficient and practical means for the prevention of disease. It requires you to cause examination to be made of questions affecting the security of health in any locality. It empowers you to order the causes of disease and mortality to be abated and removed. There is nothing in this statute to indicate any intention by the legislature to exclude from your powers and duties any cause of preventable disease of any kind. The question, therefore, resolves itself into this: Are offensive tastes and odors in otherwise wholesome public water supplies a cause of preventable disease?

This is a question of fact peculiarly within the knowledge of your department. Concerning it, you say: "Experience, covering many years, has demonstrated that when offensive tastes and odors are present in a public water supply, even though it be bacteriologically satisfactory, the people will not drink the offensive water, and, hence, their health is menaced through not using the quantity of water for drinking purposes required for the maintenance of a state of health. And, furthemore, in lieu of the bacteriologically safe water, the public resort to unknown and oftentimes dangerous waters, such as from springs, wells or bottled waters which are palatable but may not be pure."

It cannot be questioned that an abundance of water must be consumed by every human being for maintaining his health, and that any action or neglect which reduced the quantity available to him beyond a certain point would impair his health. The case presented by you is one where the quantity available to him is not absolutely reduced, but is made so offensive that many persons will not drink the quantity required for the maintenance of health. I am of the opinion that this is in effect a reduction of the quantity of available water necessary for the maintenance of public health.

The law deals with men as they are. It is true that any man could force himself to drink of the offensive water enough to maintain his health, but if, as a matter of fact, the great majority of men, or a large number of them, will not do this, but will either reduce the quantity they drink below that required for health, or will resort to unknown and potentially dangerous sources of supply, the public health will be injuriously affected. Thus, pollution of the character now under discussion becomes "a cause of disease and mortality" that your department has authority to abate and remove within the meaning of the statute, which also empowers you to determine and employ the most efficient and practical means for the prevention of disease.

Adjudicated cases show that such general broad powers for the protection of the public health as are granted to your department have been very liberally construed by the courts. For example: Health authorities may require the fencing of a city lot to prevent persons other than the owner from depositing filth upon it: Wistar v. Addicks, 9 Phila. 145. They may compel the filling of wet and swampy land: Kennedy v. Board of Health, 2 Pa. 366.

In the case of State v. Lederer, 52 N. J. Eq. 675, the nuisance complained of was offensive odors from a fat-rendering establishment which grossly polluted the air. In addition to evidence of direct disturbance of health through nausea and the like, it was shown that the odors induced many persons to close their windows at night in warm weather, which made their rooms so uncomfortable that their sleep was disturbed. The court gave consideration to this indirect effect of the odors upon health and ordered that the nuisance be restrained.

In the case of City of McKeesport v. Carnegie Steel Co., 66 Pitts. L. J. 695, the defendant caused and permitted refuse fluid to discharge into a tributary of the Monongahela River, from which the plaintiff's water supply was taken. The odor of this by-product was foul and the resulting taste of the water offensive and nauseating, rendering it unpalatable and unfit for drinking purposes and domestic use as well as injurious to health. The plaintiff sought to restrain the defendant from polluting the river in this manner. The court held that the "plaintiff's duty to supply its inhabitants reasonably pure and palatable water cannot be questioned," and decreed that a preliminary injunction be issued to prevent the wrong.

I, therefore, conclude that an industrial plant may be required to so treat the waste discharged by it to waters of the State used as sources of public water supply as to prevent the pollution of such water supply with offensive tastes and odors.

You have also asked informally whether or not this authority should now be exercised by the Sanitary Water Board.

Section 1810 of the Administrative Code (Act of June 7, 1923, P. L. 498) enumerates and defines the powers and duties of the Sanitary Water Board as follows: (a) Transfers to the board the powers of the Commissioner of Health, the Governor and Attorney-General, under the Purity of Waters Act, to control stream pollution by sewage (defined as matter containing human or animal excrement; (b) transfers to the board all other powers of the Department of Health with regard to permits for sewage-disposal works and sewer systems; (c) transfers to the board the powers of the Department of Fisheries, the Commissioner of Fisheries, and the Water Supply Commission with regard to stream pollution; (d) empowers the board to determine questions of fact as to pollution certified to it by the Public Service Commission; (e) empowers the board to make rules and regulations for the effective administration and enforcement of the laws against stream pollution; (f) empow-

ers the board to investigate and report ways and means of eliminating from streams polluting substances, to determine and recommend methods of preventing pollution and to investigate wastes discharged into streams, etc.; *(g)* empowers the board to call upon the Department of Health to make inspections, conduct investigations and do other things necessary and proper in the exercise of the powers of the board.

It is the obvious purpose of section 1810 to concentrate in the hands of the Sanitary Water Board all the powers for the prevention of stream pollution which were formerly divided among the departments, commissions and officials mentioned in that section. I am of the opinion that the authority to prevent the pollution of public water supplies by offensive tastes and odors is vested by section 1810 of the Administrative Code in the Sanitary Water Board.

Though not covered by your inquiry, it may be proper to suggest, in view of your proposed conference on this question with the health authorities of other states in the Ohio valley, that consideration be given to embodying whatever conclusions are reached by the conference in a compact among the states affected, to be approved by Congress. This procedure has many advantages over what is generally called "uniform legislation." The latter can be repealed at any time by any one of the states at its pleasure, whereas a compact duly entered into and approved by Congress is binding on all the states, so that an attempt to repeal it by any one of them alone would be void because prohibited by the clause of the Federal Constitution which forbids the states to make any law impairing the obligation of contracts.

From C. P. Addams, Harrisburg, Pa.